WILLIAM KNOTT v. MISSOURI BOILER & SHEET IRON WORKS, Appellant.

Division Two, July 14, 1923.

1. **NEGLIGENCE: Defective Pneumatic Hammer: Available Guard: Question for Jury.** Plaintiff was directed by defendant's foreman to hold a pneumatic hammer or air-gun, and while doing so, without action or negligence upon his part, the foreman bumped against him and thereby caused the air-gun to assume a perpendicular

position, and immediately the plunger was projected by the compressed air and struck plaintiff in the eye. There was testimony that if the air-gun had been supplied with a certain guard manufactured by the maker of the air-gun the injury would not have occurred; and that said guard was designed for this particular kind of air-gun, and could have been attached at moderate cost without impairing the efficiency of the machine, and had been in use for two years in numerous other cities, but not in the city in which plaintiff was employed, nor in this State. *Held*, that, whether defendant was in the exercise of ordinary care in directing plaintiff to use the air-gun without having first supplied it with the particular guard, or some other device to render it reasonably safe, if unsafe without a guard, was a question for the jury to determine.

2. ———: ———: **Borrowed by Defendant: Instruction.** Where there is evidence tending to show that the defendant directed its foreman to borrow the air-gun, that he did so and was using it in performance of the work defendant had contracted to do, that he directed the plaintiff to hold the air-gun, and while he was holding it the plunger suddenly shot out and struck him in the eye, an instruction for defendant telling the jury that before plaintiff can recover he must prove that the air-gun was furnished by defendant is misleading and should be refused.

3. ———: **Excessive Verdict: $12,500: Loss of Eye.** A verdict for $12,500 for the loss of an eye is not unreasonable.

Appeal from St. Louis City Circuit Court.—*Hon. Wilson A. Taylor*, Judge.

AFFIRMED.

*Samuel M. Rinaker* and *Charles E. Morrow* for appellant.

(1) There was no evidence upon which to base plaintiff's instruction numbered 2, or on which to submit to the jury the assignment of negligence upon which it is based. Brands v. Car Co., 213 Mo. 698, 707; Chrismer v. Bell Tel. Co., 194 Mo. 189, 208; Coin v. Lounge Co., 222 Mo. 488, 505; Williams v. Ice & Cold Storage Co., 214 S. W. 389; Van Bibber v. Swift & Co., 228 S. W. 69; Spindler v. American Exp. Co., 232 S. W. 690. (2) Said instruc-

tion, even if there was evidence upon which to base it, is erroneous. (a) It requires the defendant as a matter of law to equip the hammer with a safety device as the only means of making it reasonably safe, and declares as a matter of law that the hammer was not reasonably safe from any cause and was not equipped with the particular device, and the defendant knew it, and plaintiff was injured because of its absence, plaintiff was entitled to recover. Authorities supra. (b) It does not require the jury to find that the safety device was in common and general use, or that the defendant in the exercise of ordinary care would have provided it, but makes the defendant liable regardless of whether the same was in common and general use, and regardless of whether defendant failed to exercise ordinary care in not adopting it. Thompson v. Railroad, 270 Mo. 87, 98; Brands v. Car Co., 213 Mo. 698, 707; Chrismer v. Bell Tel. Co., 194 Mo. 189, 208; Coin v. Lounge Co., 222 Mo. 488, 505. (c) It requires the defendant to adopt the particular safety device if the hammer in question was not reasonably safe at the time plaintiff was injured, because the valve thereof was leaking air, notwithstanding the hammer was reasonably safe, if there had been nothing wrong with the valve. (d) It wholly ignores the rule that the defendant was only required to furnish such appliances as are ordinarily used in such business by prudent men.

*William L. Igoe, Vance J. Higgs* and *Robert J. Keefe* for respondent.

(1) The assignment of negligence in failing to guard the air-gun is supported by substantial evidence, and properly was submitted to the jury. (a) Since the danger of the plunger being shot out was inherent and attendant upon the ordinary use of the gun, failure to adopt a readily obtainable guard of proven practicability sufficiently supports the finding that the appliance was not reasonably safe. Kuhn v. Lusk, 219 S. W. 638; Curtis v. McNair, 173 Mo. 270; Littig v. Urbauer At-

wood Heating Co., 237 S. W. 779; Philbin v. Columbia & P. S. R. Co., 56 Wash. 610. (b) There was substantial evidence of general usage in guarding the gun. The conflict in the evidence upon this point made a question for the jury. This question was correctly submitted. Trebbe v. American Steel Foundries, 185 S. W. 179; Thompson v. Railroad Co., 270 Mo. 87; 3 Labatt on Master and Servant (2 Ed.) sec. 939, p. 2528. (c) Evidence of usage as to guarding the muzzle of the gun, while proper in evidence, was not a necessary part of plaintiff's case, since the negligence charged was not predicated merely on failure to adopt a safer appliance customarily used, but upon the fact that without a guard the gun was inherently unsafe and its ordinary use attended with great and unnecessary danger. Trebbe v. American Steel Foundries, 185 S. W. 179; Thompson v. Railroad Co., 270 Mo. 87; Kuhn v. Lusk, 219 S. W. 638; Brands v. Car Co., 213 Mo. 698. (d) Common use of an unguarded machine is not, as a matter of law, conclusive of its reasonable safety where failure to guard subjects the servant to unnecessary danger inherent in the machine and attending its ordinary operation. Johnson v. Waverly Brick & Coal Co., 276 Mo. 42; Reichla v. Gruensfelder, 52 Mo. App. 43; Kuhn v. Lusk, 219 S. W. 638; 3 Labatt on Master and Servant (2 Ed.) sec. 940, p. 2529; Wabash Ry. Co. v. McDaniels, 107 U. S. 454, 27 L. Ed. 605; Texas & Pacific Ry. Co. v. Behymer, 189 U. S. 470, 47 L. Ed. 905. (2) Instruction 2 correctly submitted the assignment of defendant's negligence in failing to provide a guard. It was not necessary to require a finding that a guard was in general use. The instruction did not exclude that matter, and Instruction 6-A directed that it be considered. Trebbe v. American Steel Foundries, 185 S. W. 179; Thompson v. Railroad Co., 270 Mo. 87.

RAILEY, C.—On November 19, 1920, plaintiff commenced this action in the Circuit Court of the City of St. Louis, Missouri, to recover damages from defendant.

a Missouri corporation, alleged to have been sustained by him while in the service of said company, under its foreman, on the date hereafter mentioned. The petition alleges that on March 16, 1920, plaintiff was working under defendant's foreman in repairing a certain locomotive, which said work consisted, in part, of riveting together pieces of iron and steel with a pneumatic hammer or air-gun, furnished by defendant and being used in said work; that said hammer or air-gun consisted of a metal cylinder, eighteen inches in length, and in which a solid piece of steel, about ten inches long, known as a plunger, moved forward and backward, under the force of compressed air; that said cylinder or gun was open at one end; that there was attached to the other end, a hose or rubber tube, through which compressed air was forced into said gun; that the passage of air was controlled by an in-take valve, operated by a trigger on the handle of said gun; that other valves and springs were so arranged that when the muzzle, or open end of said gun, was held against a rivet and pressure applied to said trigger, air under high pressure would be admitted into said tube, driving the plunger with great speed and force against a metal die, whereby the latter was caused to strike the rivet with great force, and to continue to so operate with great velocity while pressure was kept on said trigger, but unless the muzzle or open end of said gun was held against a rivet, or other object presenting strong resistence to the passage of the die and plunger, the operation of the in-take valve and the admission of air into the cylinder would cause said die and plunger to be projected and shot from said gun with terrific force and speed.

The petition then alleges that, at the times named, the pneumatic hammer or air-gun aforesaid was dangerous, defective and unsafe in the following particulars, to-wit: That the muzzle or open end of said gun was not provided with a guard to prevent the die and plunger from being ejected therefrom, although an effective and sufficient guard for this purpose could easily have been

provided without impairing the effectiveness of said tool for any purpose of interfering with its use as a riveter; that the aforesaid trigger was exposed, unguarded and unprotected, although a slight pressure or touch would suffice to operate it and to open the said in-take valve, and although an effective guard could easily have been provided for said trigger which would have prevented its operation through accident or inadvertence without thereby lessening the effectiveness of said gun for any purpose; that the valves, and particularly the in-take valve, of said gun were defective and disordered and could not be entirely closed when said gun was not in use, and that by reason thereof air was constantly leaking through said valves and being admitted into said cylinder without the application of any pressure to the trigger of said gun, in sufficient volume and with sufficient force to cause the operation and ejection from said gun of the aforesaid die and plunger.

Plaintiff further avers that the defendant knew or by the exercise of ordinary care could have known of said defects and of the dangerous, unguarded and unsafe condition of said tool as aforesaid, and could by the exercise of ordinary care have remedied the same, but that wholly neglecting and disregarding its duty to the plaintiff in that behalf, it carelessly and negligently furnished and maintained the said tool in its dangerous, defective and unguarded condition as aforesaid, at the place where plaintiff was working, and carelessly and negligently caused and allowed it to be used in said work.

Plaintiff further states that while he was engaged in the aforesaid work under the supervision of defendant's foreman, he was ordered and directed by said foreman to take hold of said pneumatic hammer or air-gun, and that in compliance with said order he did take said gun in his hands; that thereupon and without any fault or act on his part, and because of the dangerous and defective and unguarded condition of said gun as hereinbefore described, the plunger thereof projected and shot from said gun with great force and velocity and struck

plaintiff in the face and left eye, whereby he was injured as follows, to-wit: That his left eye was entirely destroyed; that the muscle and ligaments around said left eye were cut and bruised; that he sustained severe bruises and contusions about his face and a fracture of one of the bones thereof; that the sight of his right eye and his hearing were and are greatly impaired; that he received a severe shock to his nerves, and his nervous system, and that he has suffered and still does suffer great and serious pain by reason of his said injuries. He claimed to have been damaged by reason of the negligence aforesaid in the sum of $25,000, and prayed judgment accordingly.

The answer upon which the case was tried contained (1) a general denial; (2) a plea of contributory negligence; (3) that plaintiff's injuries were caused by the negligence of a fellow-servant; and (4) a plea of assumption of risk.

The reply was a general denial.

The case was tried before a jury on April 26th, 1921, and a verdict returned in favor of plaintiff for $17,500, and judgment was rendered accordingly.

The plaintiff's evidence tended to prove that on the 16th day of March, 1920, he was in the employ of the defendant, working under Mr. Adelman who had authority to direct him in his work. The two were engaged in working on the flues of a locomotive engine at Lemp Brewery in St. Louis. The place of work was about thirty blocks from defendant's plant and shop. Mr. Adelman and plaintiff had been working on this job about a week at the time plaintiff was injured. Mr. Adelman, who was not in the employ of defendant at the time of the trial, testified that he had been instructed by the defendant's superintendent to get the tools he needed in the work and did not have, from Lemp's Brewery. In doing the work they used a pneumatic air-hammer, spoken of in the evidence as an air-gun. This device was cylindrical in form, had a hand-hold at one end, was

hollow, and in its barrel was a valve which worked a piston or plunger back and forth, and this plunger struck a die placed in the end of the barrel. The die was held in place so it would not fall out by means of a spring. When the die was placed against an object and the device was in operation, the plunger working against the die, caused it to hammer the object it was held against. The power was compressed air and was communicated to the hammer by means of a hose. In the hand-hold or handle was a device, worked with the finger, called a trigger, which opened and closed a valve thus communicating air pressure on the plunger or shutting it off, as the operator desired. By pressing the trigger, the valve was opened and the hammer would operate, and when the pressure on the trigger was taken off the valve would close and the hammer would cease to operate. The air pressure was from 115 to 120 pounds and the force of the stroke of the hammer was measured by the amount of the pressure of the air. Air-hammers had been furnished by the defendant, which had been taken to the place of work from defendant's shop, but they were too small, and on the day plaintiff was injured and a short while before his injury, Mr. Adelman sent plaintiff to defendant's shop for another hammer, and the plaintiff procured another hammer at defendant's shop and returned with it to the place of work, but said hammer was not used. In the meantime Mr. Adelman had gotten a hammer from Lemp's which he was using at the time plaintiff was injured. Mr. Adelman testified that just before the plaintiff was injured, he noticed that the hammer he was using, which had been procured by him from Lemp's was leaking air; that sometimes particles of dirt got into the trigger valve which would prevent it from completely closing and that air would be permitted to escape into the hammer, and that this might cause the hammer to operate and to shoot the die out of the end of the barrel thereof. That the spring, which held the die in the hammer, would not be sufficient to keep the die from being projected from out of the hammer when it was in operation, unless

the die was against something. The evidence also tended to show that if the hammer was leaking air and was held in a perpendicular position, it was liable to shoot the die out of the hammer without the trigger valve being operated.

The plaintiff and Mr. Adelman were working in the firebox of a locomotive, on the flues of the boiler thereof. A device called a "prosser," which was a piece of metal, cylindrical in form, and the size of the flues, was driven into the flues by the use of the hammer to expand the flues. After it was driven in by means of the air-hammer, it was taken out by tapping it with an ordinary hammer and working it loose so that it would come out. The air-hammer in question had only been used to drive the prosser into three flues, and Mr. Adelman, after driving the prosser into the third flue, handed the air-hammer to plaintiff to hold while Adelman worked the prosser out of the flue. The plaintiff was standing close by and in obedience to this request, took hold of the air-hammer, holding it in a horizontal position, and Mr. Adelman stooped over and turned to pick up an ordinary hammer to get the prosser loose and bumped against the plaintiff in such a way as to cause the air-hammer to be in a perpendicular position, and the plaintiff testifies that without the trigger thereof being touched, the die was projected out of the barrel of the hammer and against the plaintiff's face and injured him.

The plaintiff's evidence further tended to prove that the company which manufactured the air-gun in question had lately also been manufacturing an appliance called "M. S. Safety Device," which could be placed on the hammer in question by cutting threads on the end of the barrel or muzzle thereof, which would prevent the die from being projected from out of the hammer by the force of its operation. That some of the hammers with such a device thereon, were on the market and had been used at different places in the country for several years. That the safety device also had been placed upon the market and that it could be attached to the gun in ques-

tion by threading the barrel thereof and placing it on it, and that it was practicable to so do. Plaintiff's witness Gleason testified that this safety device had been in use for a couple of years and that he had seen it used in Norfolk, Virginia; Baltimore, Maryland; Savannah, Georgia, and New Orleans, Louisiana, within the last year in his travels in the shipyards, where the device was used on all work.

Mr. Streib, the business representative of the Boiler Makers' Union, testified to the workings of the hammer in question and stated that he was familiar with the safety device in question. He stated that he had used an air-hammer with such a device on it in Venice, Illinois, on the McKinley Power House, in 1910 and 1913, and also in Norfolk, Virginia, in the shipyards and a boiler shop combined; that he had used them in three places in the last sixteen years.

I. W. Rose, a sales engineer for the Chicago Pneumatic Tool Company, testified for plaintiff that he was familiar with the air-hammer and safety device in question, and that the same could be applied to such a hammer as was being used at the time plaintiff claims to have been injured, by threading the end of the barrel thereof and placing it thereon. That the safety device, which was before him, had been taken out of stock; that he had connection with the company for more than two years and had spent some time at the plant where they were made. A hammer, such as the one used at the time plaintiff claims to have been injured, without such a device thereon, was shown him and he testified that such a hammer was the one in customary and usual and ordinary use by boiler-makers; that it was the customary gun used by boiler-makers. That such a device was practicable for all purposes in use, but that hammers were manufactured and sold similar to the one which was being used at the time plaintiff claims to have been injured.

On re-cross examination this witness was again shown a hammer similar to the one used at the time plaintiff claims to have been injured, without such a safety device thereon, and was asked:

"Q. Now, I am going to ask you, among boiler-makers and men, just ordinary men, engaged in the boiler-making business, which type of gun is the most frequently used, the gun I hold in my hand or the gun with those threads on the end? A. The gun that you have in your hand.

"Q. The gun that I have in my hand? A. Yes, sir."

It was not shown by the plaintiff that it was the common and general custom to use an air-hammer equipped with a safety device, nor was it shown that a hammer so equipped with such a device was in common and general use at and prior to the time plaintiff claims to have been injured. Nor was it shown that it was the common and general custom to so equip all hammers with such a safety appliance at and prior to the time plaintiff claims to have been injured. Nor was it shown that the hammer in question was not reasonably safe, when in ordinary working order. But that sometimes something would get in the valve.

The injuries sustained by plaintiff will be considered later.

During the examination of witness Adelman the following occurred:.

"Q. I will show you the handle on this gun and ask you whether this gun had such a handle as that?

"Mr. Barnett: I object to that; in the first place, the guns are here and it is perfectly apparent that they were two different makes and construction; and the witness has already said that the gun is of a different type; and the comparison of these guns before the jury is improper.

"Mr. Igoe: I am merely asking this man whether the devices that are on this gun were on the gun he was using, and I don't want to show by him that they are of

the same type. I will show that later on, if I can; but I want to show, if I can, by him, that the gun he was using was not equipped with those appliances. We allege that as a ground of negligence.

"THE COURT: Do you charge that he could have guarded the one he was using?

"MR. IGOE: Yes.

"THE COURT: I will permit you to ask the question of the practicability of guarding the hammer that you claim injured this man. But you may not do that by showing that some other device was guarded. I had in mind that maybe you had charged that the defendant didn't use the most modern and up-to-date methods, which is an act of negligence, too, that doesn't seem to be in this petition. I thought that that was your purpose to show that that one was a more improved machine than the other one; but you haven't charged that, so I don't think you are getting anywhere by introducing this second hammer, in so far as your effort to show the practicability of guarding the one that hurt him.

"MR. IGOE: The charge in the petition is that it was not equipped with the guard that we have described and the guard over the trigger.

"THE COURT: Under your charge, it is up to you to show that it was practicable to guard the hammer which hurt him, and that may not be made to depend upon the fact that a hammer of a different kind was guarded.

"MR. IGOE: I want to show that the hammer that he was using had no guards on it.

"THE COURT: This is probably manifest from looking at it. You have to show that it could be guarded, and you can't do that by showing that a different kind of hammer is guarded.

"MR. BARNETT: I think that the jury should be instructed to disregard your Honor's remarks, as to whether or not the use of a more modern and up-to-date appliance would be an act of negligence.

"THE COURT: There is no such issue before the jury, and that should be sufficient."

"To which ruling of the court, the defendant then and there at the time duly objected and excepted, and still continues to object and except."

At the close of plaintiff's evidence, defendant interposed a demurrer thereto, which was overruled.

Defendant's evidence tended to prove that the hammer or air-gun in question, which was in use at the time of plaintiff's injuries, was the ordinary, usual and customary hammer used by boiler-makers generally. This fact was shown by a number of witnesses, and by the sales engineer of the company which manufactured the hammer in question. The evidence of appellant also tended to prove that neither plaintiff nor Adelman, the foreman, had authority to borrow the hammer in question for use; that defendant had plenty of hammers for such use, and that specific orders had been issued for tools not to be borrowed, without special direction and permission; that defendant had furnished hammers and other tools sufficient to do the work in question, except an expander, which the Lemps desired used for the reason that the tubes were of special size; that Adelman and plaintiff were fellow-servants, and the former had no authority to direct plaintiff in his work.

The defendant's witness Mr. Hunt, sales engineer of the Chicago Pneumatic Tool Company in St. Louis, testified that the hammer in question was manufactured by his company and also the safety device or guard mentioned in the evidence was manufactured by his company; that he had been with that company in St. Louis for the last six years and was familiar with the hammers in question and all the hammers which had been mentioned in the evidence, all of which were manufactured by his company; that the company manufactured hammers without safety guards and hammers with safety guards, and that the hammer without the special safety guard was the ordinary, customary and usual hammer sold to the trade and used by boiler-makers generally; that a hammer without a safety guard was the one most

29 Mo.—40.

frequently sold; that it was his business to get around among boiler-makers in St. Louis; that there were about eight shops in the city, and that he had never seen a hammer used in any of these boiler-maker shops equipped with the safety guard mentioned; that such a safety guard could be applied to the hammer such as the one being used at the time plaintiff claims to have been injured, by threading the end of the hammer and that such a device would prevent the die from being projected from out of the hammer.

Defendant's evidence further tended to show that a leak in the trigger valve would not cause the gun to be discharged and the die to be suddenly projected therefrom. This was because there was a port or valve which closes and opens, the same as a steam engine, and if the air gets past a certain point by reason of a leak, there would be no direct pressure of the piston, for it would go past the port hole and go right through and you would not have pressure.

A motion for a new trial was filed in due time, and, on October 10, 1921, the court required a *remittitur* of $5,000 to be entered, which was done, and said motion for new trial overruled.

The instructions and rulings of the court, during the progress of the trial, will be considered in the opinion.

An appeal was allowed defendant from the judgment aforesaid as modified.

I. Instruction 1-A, given in behalf of plaintiff, reads as follows:

"If you believe from the evidence that on the 16th day of March, 1920, the plaintiff was in the employ of the defendant as a boiler-maker's helper, and that on said date he was working under the immediate supervision of defendant's foreman, and that it was his duty in the course of his employment to comply with the orders and directions of said foreman, and that while so engaged he was directed by said foreman to hold a certain pneumatic hammer or airgun, and that in compliance with said direction he took

General Instruction.

hold of said hammer; and if you further find that at said time one or more of the valves in said hammer was defective, and that by reason thereof air was leaking into the cylinder of said hammer and that there was likelihood of the plunger being thereby forcibly shot out from said hammer, and that on account of such leakage of air (if you find that there was such leakage), said hammer was not reasonably safe for the plaintiff to handle, and that the defendant knew, or by the exercise of ordinary care could have known, that said hammer was not reasonably safe because of such leakage (if you find that it was unsafe in this respect), and if you further find from the evidence that while the plaintiff was holding said hammer as aforesaid, the plunger thereof was shot out by reason of said leaking air and without negligence on the part of the plaintiff contributing thereto, and that he was thereby injured, and if you further find that the danger to plaintiff by reason of such leaking air (if you find that said hammer was dangerous in this respect), was not known to plaintiff and was not so imminent and obvious as to threaten immediate injury to him, and that he might reasonably have supposed that he could safely hold said hammer by the exercise of ordinary care on his part, then your verdict should be for the plaintiff."

The above instruction was objected to by appellant at the trial below, but the giving of same is not assigned as error here. In considering other questions presented, we have deemed it advisable to set out the instruction supra, in order that we may keep in mind the general theory on which the case was submitted to the jury.

II.  Appellant contends that, "there was no evidence upon which to base plaintiff's instruction numbered 2, and on which to submit to the jury the assignment of negligence upon which it is based." The following authorities are cited by appellant in support of this contention: Brands v. St. Louis Car Co., 213 Mo. l. c. 707; Chrismer v. Bell Telephone Co., 194 Mo. 189, l. c. 208; Coin v. Lounge Co., 222 Mo. 488, l. c. 505; Williams v. Ice Co.,

214 S. W. 385,.1. c. 389; Van Bibber v. Swift & Co., 228 S. W. 69; Spindler v. American Express Co., 232 S. W. 690. Said instruction reads as follows:

"If you believe from the evidence that on the 16th day of March, 1920, the plaintiff was in the employ of the defendant as a boiler-maker's helper, and that in the discharge of his duty he was required to handle a tool known as a pneumatic hammer or riveter, and if you further find that said hammer was so constructed and its principle of operation was such that there was likelihood of the plunger thereof being shot out while said hammer was being handled with ordinary care and caution, and if you further find that said hammer could have been equipped with a guard over the muzzle thereof and that said guard would have prevented the ejection of the plunger without interfering with the free use and operation of the hammer or impairing effectiveness (if you so find), and if you further find that said hammer was not equipped with a guard over the muzzle thereof and that by reason thereof it was not reasonably safe for the plaintiff to handle, at the place where he was working, and that the defendant knew, or by the exercise of ordinary care could have known, that said hammer was not reasonably safe, because not equipped with such a guard (if you find that it was unsafe in this respect), and if you further find that at the time of the injury complained of, plaintiff, while in the discharge of his duty, was holding said hammer in his hands and that while so engaged the plunger in said hammer was forcibly ejected because of the absence of such a guard and without negligence on the plaintiff's part directly contributing thereto, and that as a direct result of the ejection of said plunger plaintiff was injured; · and if you further find that plaintiff did not know of the danger of handling said hammer without a guard over the muzzle (if you find that said hammer was dangerous in this respect), and that such danger was not so imminent and obvious as to threaten immediate

*Duty to Guard Dangerous Machine: Question for Jury.*

injury to him, and that plaintiff might reasonably have supposed that he could safely hold said hammer by the exercise of ordinary care and caution on his part, and that at the time of the injury complained of he was in the exercise of such care and caution, then your verdict should be for the plaintiff.''

The converse of above instruction was also given by the court, and reads as follows:

''The court instructs the jury that defendant was not required to furnish plaintiff with tools or appliances which were absolutely safe; but if the air-gun in question was of the same character as ordinarily used by men of average prudence, engaged in the same business, then you will find that defendant discharged its duty in that regard and your verdict should be for defendant.''

It is manifest from reading above authorities, in connection with those cited by plaintiff, and hereafter referred to, that this is a close case, and one not altogether free from doubt. The facts are so fully set out in the preceding statement, that it will not be necessary to refer to same, except in a general way.

Substantial evidence was offered by plaintiff tending to show that the Boyer gun in use when he sustained the injuries complained of, was manufactured by the Chicago Pneumatic Tool Company, and that said company also manufactured the M. S. device, mentioned in evidence, and sold the same in St. Louis, Missouri; that the above guard could be applied to any Boyer gun by threading the end of the barrel, and that with this guard it would be impossible for the die or plunger to be shot out under any circumstances. It was also shown by the testimony for plaintiff that the M. S. guard was practicable, and would not impair the usefulness of the gun; that for several years before the trial, boiler-makers had been using the M. S. safety device as a guard for the muzzle of the Boyer gun, in Norfolk, Virginia; Baltimore, Maryland; Savannah, Georgia, and New Orleans, Louisiana, where they were used in shipyards.

We will now refer to the authorities supra cited by appellant.

In Brands v. Car Co., 213 Mo. 707, the plaintiff was injured by the explosion of an emery wheel, while he was in defendant's service at its factory in St. Louis, Missouri. It was charged as a ground of negligence that the wheel was defective and dangerous, because it was of uniform thickness, when it should have been made thicker at the center, or what is called a convex wheel should have been used to lessen the danger. GANTT, J., at pages 709-10, in referring to the evidence, said:

"It was developed from the examination of these same witnesses that emery wheels were constantly in use in all great manufacturing establishments of this country for the purpose of grinding castings and tools, and that the so-called straight emery wheel, a wheel of the character of the one which broke in this case and injured the plaintiff, was of general use in all large manufacturing establishments, at least in the vicinity of St. Louis, . . . and it was shown that in the shops of the defendant there were fifty emery wheels in operation all the time, and about 500 would be used during the year, and only one had ever broken or exploded prior to the injury to the plaintiff, so that the substance of this testimony from both sides established that occasionally at rare intervals a straight emery wheel had been known to explode."

On pages 711-12, Judge GANTT said:

"We think it is clear that under the evidence in this case up to the time, at least, of the injury to plaintiff, the defendant was not negligent in failing to adopt what is known as the convex wheel, as the proof was overwhelming that in all manufacturing establishments of a similar character to that of the defendant's this convex wheel was only in use by two of them."

On page 708, in considering the law of the case, he cited a number of authorities, and quoted as follows: "No man is held by law to a higher degree of skill than the fair average of his profession or trade, and the

standard of due care is the conduct of the average prudent man.''

The cause was reversed without remanding.

In Chrismer v. Bell Tel. Co., 194 Mo. 189, the plaintiff was thrown from an overturned boat into the water by reason of alleged insecure oar locks. The cause was reversed outright, and VALLIANT, J., dissented in an opinion filed, which was concurred in by GANTT and BURGESS, JJ.

In Coin v. Lounge Co., 222 Mo. 488, plaintiff claimed to have been injured while operating a wheel with saw attached, on account of the saw slipping off the wheel. He testified that' the rubber band on the upper wheel was loose. One Sanborn and McGee testified for plaintiff that there were devices in use which could have prevented the saw leaving the wheel, but they had only seen *one* in use with a guard, and that was improvised by the workman using it. On page 503, GANTT, J., in considering the facts, said:

''On the other hand, the defendant introduced sixteen witnesses, men of age and experience who qualified themselves to testify to the customary usage, and they stated that band saws were customarily used without guards. These witnesses included, among others, two factory inspectors, whose duties required them to inspect and visit every shop in the State, and the foreman of the Huttig-Moss factory where one of the only three guards was located. This customary usage covered not only St. Joseph, Atchison, Topeka, Kansas City and St. Louis and other cities in this State, but Colorado Springs, Duluth, Chicago, New York and other cities in New York State. It also showed that no manufacturer of band saws ever furnishes a guard, shield or gate with a band saw.''

On page 508, Judge GANTT further observed: ''It is conceded by the plaintiff that no human agency could detect and demonstrate what the exact cause of the saw leaving the wheel was.''

In concluding the opinion, on page 514, Judge GANTT, said:

"Plaintiff had worked with this machine for three years, he was fully and thoroughly acquainted with its use and management, and we do not agree with counsel for the plaintiff that this was an antiquated machine; it may not have been the very latest and newest design, but it was not a defective machine, and the plaintiff having accepted employment to work with this machine and having worked on it for three years, could not require the defendant to make changes by providing new and different appliances, but must be held to have assumed by his contract of employment the usual and ordinary dangers in operating said band saw."

Under foregoing and other circumstances, the case was reversed outright.

In Williams v. Ice Co., 214 S. W. 386, the plaintiff injured his fingers while screwing down an oil cup without an extension. He sought to recover damages on the ground that such a rod should have been furnished, and were in use where he had worked. GRAVES, J., after quoting from Ruling Case Law, Cyc., etc., at page 389, said:

"The test is whether the master has exercised ordinary and usual care in the selection of the instrumentalities, and that such instruments are reasonably safe for the use. He is under no obligation to have the best or latest appliances."

The plaintiff was nonsuited in the court below, and the judgment was affirmed in this court on the ground that plaintiff was guilty of contributory negligence, and that no negligence was shown upon the part of defendant.

The case of Van Bibber v. Swift & Co., 228 S. W. 69, is so different in its facts from the case at bar, that we do not deem it necessary to discuss it.

In Spindler v. American Exp. Co., 232 S. W. 691-2, the plaintiff's husband was killed while operating a freight elevator. SMALL, J., disposed of the case as follows:

"It must be borne in mind that there was no defect in said elevator arising from failure to keep it in repair,

but the claim of plaintiff is that it was negligently constructed and maintained, because there was no guard on the platform to protect the operator, when he reached down to grasp said ring, from being injured by the descending guard; that the space between the truck and the descending guard was so narrow that in reaching for such ring the plaintiff's husband, or any other employee operating the elevator, was likely to protrude some part of his body over the edge of the platform and under the descending guard, and be injured thereby; that this was an open, obvious, and unnecessary danger, and it was negligence in the defendant to subject its employees thereto in doing their work. But the evidence shows that there were thirty-one elevators at the said Union Station, all used as plaintiff's husband was using the elevator which injured him; that for years they had been in such use, not only by defendant, but by other express companies, by the Terminal Railway Company itself, in handling the baggage of the numerous railroads entering said Union Station, and by the United States in moving mail. In fact, no other method of moving express matter, baggage, and mail from the subway to the cars on said ground floor was shown to exist, except by means of said elevators, all of the same size and constructed, equipped, and operated in precisely the same manner as the one which injured the plaintiff's husband. Such being the undisputed facts shown by the plaintiff's testimony, under the law firmly established by this court, we must hold there is no evidence tending to prove negligence on the part of the defendant.''

It was held that the demurrer to the plaintiff's evidence should have been sustained.

On the other hand, we are confronted with decisions of this court, which sustain the action of the trial court in the giving of said instruction numbered two. One of the leading cases on this subject, which has been cited and followed *many times* in this court, is that of Huhn v. Mo. Pac. Ry. Co., 92 Mo. 440. The plaintiff's husband was

defendant's yardmaster at Independence, Missouri, and was run over and killed by a freight train backing into said yard. BLACK, J., stated the facts in above case at page 443, as follows:

"The negligence alleged is a failure to block the guardrail. The evidence upon this question offered by plaintiff shows that some roads, at their yards, place a wooden block between the guard and track-rail, so as to fill the space up to the ball of the rails, leaving room for the flange of the car wheels. At least three roads block the rails, and there is evidence that this defendant does the same at its yards at Kansas City, though none of the rails were blocked at its yards at Independence. One of the witnesses, who had been in the railroad business for seven years, says it is customary for the roads in this State to block these rails, but from the evidence of other witnesses it appears that many do not. Some of the witnesses say, in emphatic terms, that it is dangerous to work in yards where the guardrails are not blocked, and all who profess to know anything about it agree that blocking adds to the safety of those employees engaged in switching. One witness on cross-examination stated that spikes, nuts, and stones were liable to get in the open space, and then there would be more danger of the cars being thrown off than there would be if not blocked; and that, upon the whole, it was a disputed question among railroad men, which was best, blocking or no blocking. Another witness said he had never found one man but said blocking was proper, and safer for the employees."

In discussing the law of the case, Judge BLACK, on pages 449 and 450, said:

"It is true that the question of negligence cannot be resolved, alone, upon the fact as to how many roads do, or do not, block the guardrails. Nor can it be said the company was guilty of negligence, simply because the blocks make it safer for the employees. These are facts, however, to receive a proper consideration from the jury.

It may be that the use of blocks would be imprudent, on the main line, and quite essential in the car yards, where the employees are constantly engaged in coupling and uncoupling cars, for, as the danger increases, the care should increase. The guardrail, in this case, was on the side track leading to the main track. The defendant was not called upon to discard the existing rails. The defendant seems to have recognized the propriety of using the blocks in some of its car yards; there is certainly evidence that it does use them in one. They are used by some other roads, and there can be no doubt but the evidence here, in no way contradicted, shows that they add much to the safety of the employees. Where the facts are either disputed, or different inferences may be fairly drawn from the undisputed facts, the question of negligence should be submitted to the jury. [Mauerman v. Siemerts, 71 Mo. 101; Nagel v. Railroad, 75 Mo. 653.] We think this case comes within the rule, and the question was properly submitted to the jury.''

There was no statute in existence requiring the railway company to block its guardrails when the Huhn Case was tried.

In Hamilton v. Rich Hill Mining Co., 108 Mo. l. c. 373-4, the plaintiff was permitted to recover damages on account of having his foot caught in an unblocked switch track and run over by a moving car. This was likewise before the passage of the blocking statute, and the ruling in the Huhn Case was followed.

In Smith v. Fordyce, 190 Mo. 1, and following, the plaintiff, a car repairer in the service of defendants as receivers for the K. C. P. & G. Railroad Company, was injured while repairing a car on the defendants' tracks, by the escape of a car running wild, which collided with the car or train on which plaintiff was working, and injured him. The plaintiff charged defendants with negligence, in having failed to place near the intersection of the switch track, on which said car was located, and the main line, what is commonly known as a derailing switch,

or some other means of obstruction, so that if cars on said switch track did escape, they could not roll down on the main line where plaintiff was at work. GANTT, J., on page 24, in discussing the above subject, said:

"Nor did the court assume as a matter of law that it was negligence not to have a derailing switch, but left it to the jury to say whether in the light of all the circumstances a derailing switch or other like device should not have been provided. . . .

"The rule is well settled in this State that there is no obligation on the part of the master to furnish absolutely safe appliances, nor is a railroad bound to adopt every new invention, though an actual improvement it may be, but it is the duty of the company to use reasonable care and precaution in procuring and keeping its appliances in good condition and order, and it cannot remain wholly indifferent to the improvements of the day. [Huhn v. Railroad, 92 Mo. 440; Hamilton v. Coal Co., 108 Mo. 364.]

"In these cases it is left to the jury to say whether under all the facts and circumstances it was negligence in the company not to have had a derailing switch at the junction of this switch track with the main track of the defendant's line. There was evidence in this case tending to show that derailing switches were in general use by the defendants on their line of railroad at the time of the injury to plaintiff, and that it was a common device used for the purpose of preventing cars escaping on to the main tracks from switches. . . . We do not, therefore, say that the defendant in this case was negligent because the side track was not equipped with the derail switch, although it is quite evident that if it had been so equipped this accident would not have occurred. Therefore, the question of whether the spur track in this case was a reasonably safe appliance without a derailing switch was a question for the jury, and such is the view taken by the circuit court, and it was left to the jury to find whether the injury to plaintiff resulted in part on account of the absence of a derailing switch."

The judgment in behalf of plaintiff was affirmed by this court.

In Kuhn v. Lusk, 281 Mo. 324 and following, 219 S. W. 638, the plaintiff, while engaged in his work for defendant, was required to look after the belts, and clean certain motors and machinery. The motor proper was cleaned by blowing the dust and dirt out with compressed air conveyed through the nozzle of a hose applied at the openings in the motor cover. While attempting to clean the boxing at this place, plaintiff was hurt. He was in a squatting position and took hold of the ring at the top of the motor cover with his right hand and, with his left, in which he held a piece of waste, he reached over and back under the shaft of the small cogwheel and began to wipe the grease off of the bottom side of the boxing, when the sleeve of his jacket was caught in the cogs and his forearm ground into a pulp. The defendant was charged with negligence, "in failing to exercise ordinary care to furnish plaintiff a reasonably safe place to work, in that defendants failed to exercise ordinary care to properly house or shield the gearing and cogwheels to said motor." The trial court by an instruction submitted the above quoted ground of negligence to the jury, and this action of the court was assigned as error. RAGLAND, C., in a carefully prepared opinion, concurred in by both commissioners and all the judges of Division One, after reviewing the authorities, referred to an opinion of Judge NORTONI's in the case of Letanovsky v. Shoe Co., 157 Mo. App. 120, where it was held to be a question for the jury as to whether defendant was negligent in failing to provide a guard for a splitting machine in a shoe factory. RAGLAND, C., after stating the above ruling of Judge NORTONI, said: "And we so hold in the case at bar with respect to the defendant's failure to maintain a guard or cover on the cogwheels which caused plaintiff' injury. [18 R. C. L. 594, sec. 94; Brooks v. Oil Co., 100 Miss. 849, Ann. Cas. 1914 A, 656; Dettering v. Levy, 79 Atl. (Md.) 476; Westman v. Lumber Co., 91 Pac.

(Ore.) 478; Prattville Cotton Mills v. McKinney, 59 So. (Ala.) 498.]''

In the still later case of Stewart v. Laclede Gas Light Co., 241 S. W. 909, the plaintiff sued for the death of her husband, who was killed while in the service of defendant, by falling into a coal pit, into which he was dumping coal from railroad cars in the prosecution of his work. The depth of this coal pit, into which deceased fell, was from twenty to twenty-five feet. JAMES T. BLAIR, J., in considering the law and facts of the case said, at page 911:

"There can be no doubt that the dumping of these cars while standing on a plank a foot wide over a pit twenty-five feet deep, when the force necessary to be used and the obscuring of the vision by coal dust and the facts that the employee's hands would be engaged with the wrench and his body would have to assume a decidedly stooping posture, and that the doors would suddenly fly back when released, are all considered, was attended by danger. It is quite obvious that simple precautions might have been taken which would have obviated the danger of an employee falling while at this work. A banister or railing could have been constructed which would in no way have interfered with the work if a slightly wider platform had been used or a wider support in itself would have greatly minimized the danger. In Henderson v. Mfg. Co., 197 S. W. (Mo. App.) l. c. 180, this question is discussed, and the following is quoted from Mather v. Rillston, 156 U. S. l. c. 398, 399, 15 Sup. Ct. 467, 39 L. Ed. 464:

" 'All occupations producing articles of works of necessity, utility, or convenience may undoubtedly be carried on, and competent persons, familiar with the business and having sufficient skill therein, may properly be employed upon them, but in such cases where the occupation is attended with danger to life, body, or limb it is incumbent on the promoters thereof and the employers of others thereon to take all reasonable and needed pre-

cautions to secure safety to the persons engaged in their prosecution, and for any negligence in this respect from which injury follows to the persons engaged, the promoters or employers may be held responsible and mulcted to the extent of the injury inflicted. . . . If an occupation attended with danger can be prosecuted by proper precautions without fatal results, such precautions must be taken by the promoters of the pursuit or employers of laborers thereon. Liability for injuries following a disregard of such precautions will otherwise be incurred, and this fact should not be lost sight of.'

"The same principle was approved in Curtis v. McNair, 173 Mo. l. c. 283, 73 S. W. 167; Bowen v. Railway, 95 Mo. l. c. 275, 8 S. W. 230; Kuhn v. Lusk, 281 Mo. 324, 219 S. W. 638, and in numerous other decisions of this court. There are like holdings elsewhere. [Dailey v. Swift & Co., 86 Vt. l. c. 200, 84 Atl. 603; West v. Tanning Co., 154 N. C. l. c. 49, 69 S. E. 687; Benenson v. Swift & Co., 127 Minn. l. c. 434, 149 N. W. 668; Schultz v. Ericsson Co., 264 Ill. l. c. 167, 106 N. E. 236; Kozowski v. Ostrowski, 163 Ill. App. l. c. 202; Railway v. Heney, 211 Fed. (C. C. A.) l. c. 462; Denchfield v. Railway, 114 Minn. l. c. 61, 130 N. W. 551; Storey v. Mardis Co., 186 Iowa, 809, 173 N. W. 115; Probst v. Box Co., 200 Mo. App. 568, 207 S. W. 891; Donohue v. Lumber Co., 224 N. Y. 149, 120 N. E. 117; Schunnemunk Const. Co. v. Sbarrata, 239 Fed. l. c. 717, 152 C. C. A. 550; Maloney v. Steamship Co., 217 N. Y. l. c. 280, 111 N. E. 835; Armour v. Golkowska, 202 Ill. l. c. 146, 66 N. E. 1037.] The principle applied in Williamson v. Light & Power Co., 281 Mo. 544, 219 S. W. 902, is applicable here. The question whether appellant was negligent was for the jury."

The decision of the Supreme Court of the United States in Mather v. Rillston, from which the above quotation was made, has been sustained in several of the Missouri cases, heretofore cited.

Turning to the facts in this case we find, according to plaintiff's evidence heretofore detailed, that he was directed by his foreman to hold the gun in question and, while doing so, without action or negligence upon his part, the foreman bumped against him and thereby caused the gun to be in a perpendicular position and the die to be projected so as to strike plaintiff in the eye. The latter's testimony shows that if the gun in question had been supplied with the M. S. guard heretofore mentioned, the injury would not have occurred; that said guard could have been furnished at a moderate cost, and used without impairing the effectiveness of the gun. Taking into consideration the facts in this case, we are of the opinion that the trial court committed no error in submitting to the jury the question as to whether defendant was in the exercise of ordinary care, in directing the plaintiff to use the gun in question, without it being supplied with the M. S. guard, or some other device to render it reasonably safe, if unsafe, without such guard. We accordingly hold that the court committed no error in giving Instruction 2, heretofore mentioned.

III. It is insisted by appellant that its Instruction B should have been given. It reads as follows:

"The court instructs the jury that before plaintiff can recover, plaintiff must prove by the greater weight of the evidence that the air-gun in question was furnished by defendant."

Borrowed Air-Gun.

This instruction is misleading, and submits a proposition of law, and not one of fact to the jury. The plaintiff's evidence tended to show that defendant's foreman, Adelman, by authority from his company, borrowed the gun from the Lemp Brewery, and directed plaintiff to hold the same. The court submitted this question properly in Instruction 3-A, which reads as follows:

"The court instructs the jury that before you can find for the plaintiff, you must believe from the evidence that Adelman was plaintiff's foreman as described in Instruction No. 1, and you must further believe from

the evidence that said Adelman acted within the scope of his authority in using a borrowed air-gun.''

This assignment of error is without merit and overruled.

IV. We are of the opinion, that no error was committed by the court in refusing defendant's Instruction E, as asked.

V. The testimony as to plaintiff's injuries, is similar to that given in the recent case of Adams v. Railway Co., 287 Mo. 1. c. 554-5, where plaintiff lost an eye, and a judgment for $12,500 was affirmed by the other division of this court after a *remittitur* of $7,500 had been required. The court, in this case, required a *remittitur* of $5,000, which was entered, and a new judgment rendered for $12,500. We think the case was well tried, and has been ably argued in this court. The judgment as it now stands, is for a reasonable amount, and finding no error in the record, of which appellant can legally complain, we affirm the judgment. *Higbee, C.,* concurs.

**Verdict.**

PER CURIAM:—The foregoing opinion of RAILEY, C., is adopted as the opinion of the court. All of the judges concur.