ERNEST R. HOWARD v. MOBILE & OHIO RAILROAD COMPANY, a Corporation, Appellant.—73 S. W. (2d) 272.

Division One, June 12, 1934.*

---

*NOTE: Opinion filed at September Term, 1933, April 19, 1934; motion for rehearing filed; motion overruled at May Term, June 12, 1934.

296

*Rufus Creekmore* and *Roberts P. Elam* for appellant; *Carl Fox* of counsel.

*Eagleton, Henwood & Waechter* and *Frank P. Aschemeyer* for re-
spondent.

298

HYDE, C.—This is an action for damages for personal injuries under the Federal Employers' Liability Act, U. S. C. A., Title 45,

Sections 51-59. Plaintiff had a verdict for $14,500. Defendant has appealed from the judgment entered on that verdict.

Plaintiff was a fireman on defendant's switch engine at Cairo, Illinois. He commenced work just after midnight, March 27, 1930, and after switching several industries at Cairo, went with the switch engine to Davis Junction, about four or five miles north of Cairo. It was the duty of the switching crew to meet a freight train there about three A. M. Because of the location of defendant's Cairo bridge, its through freight trains do not come into its Cairo yards but set out cars, destined there, at Davis Junction where they are picked up by a switch engine and taken into the Cairo yards. The switching list for that morning showed that ten cars were brought from Davis Junction to the Cairo yards, three of which were moving in interstate transportation. Two of them carried oats from Iowa to a Cairo elevator. The third was loaded with flour for a town in Alabama. Defendant's evidence showed that these ten cars, coupled together, were placed upon track 6 in the Cairo yards "for mechanical inspection and for marking and carding which showed the contents and the designated point of delivery, whether to local industries or connecting lines," which was the usual way of handling cars brought from Davis Junction. "The first thing that is done is to put the cars in the west yards on a track and then detach the engine, which goes about other work, and then the work of inspection and marking of the cars begin. It would usually take from 25 to 30 minutes to inspect and mark cars." After these cars were inspected, it was the duty of the crew of the switch engine to return and remove them. "The purpose of bringing the ten cars over there to the yards was to break it up . . . disintegrate the train and put each car where it belonged."

On this particular occasion the foreman in charge of the switch engine had a verbal order to move four empty cars, which were nearby. As soon as the ten-car string was placed on track 6 for inspection and marking, the switch engine, under the foreman's direction, uncoupled from them and went to move these empty cars, located on what was known as the short house track which was a spur off of the house track. To get from track 6 to the house track it was necessary to go from 300 to 400 yards down the main line track through the yards. The switch engine made this trip, coupled onto the four empty cars on the short house track, pulled them out onto the house track lead and then pushed or kicked them north onto the house track. There was a platform between the short house track spur and the house track, so that the movement of the empty cars merely moved them from one side of the platform to the other. The switch engine was then started back to track 6 where it was to break up the ten-car string and place the cars as designated in the switching list.

Shortly after starting back plaintiff was injured. Apparently the switch engine was then on the house track lead moving toward the main line yard track.

Plaintiff's account of how he was injured was as follows:

"We started to back up—we had kicked these cars on the house track and went out there to back up, and I was down on the bottom putting in the fire, and the engineer jumped across from his side, or stepped across from the right side to the left to see his signal out of the window, or look back at the road crossing—I don't know what for, and as he turned around to step back to the right side his left foot hit the shaker bar just as I was in the act of opening the door, and the shaker bar, the top end, come and knocked it back in my eye and I was knocked unconscious."

Defendant's engineer admitted stepping from his side of the cab to the fireman's side and then stepping back again but denied that his foot touched the shaker bar. It was defendant's theory that the fireman in opening the fire door to throw in coal caused it to strike the shaker bar which was leaning against the boiler head not far from the door. Defendant had a statement signed by plaintiff stating that the door struck the bar and knocked it against him. Plaintiff, however, said that he signed this statement shortly after the accident when he could not read because of his injury and his evidence at the trial was that the fire door when opened would not come closer than one foot to the shaker bar, in the position in which it was leaning against the boiler head at the time. Defendant had measurements which it contends shows that the fire door could have struck it. The fire door opened automatically by air, operated by the fireman pressing a pedal on the floor of the cab. The evidence is not clear as to just how far back it swung. The plaintiff's statement was that the shaker bar was in the same place when he got on the engine and at all times thereafter until the accident occurred. Defendant's evidence showed that the shaker bar was an iron bar four feet one inch in length weighing 21½ pounds. It fitted upon bars projecting through the floor, connected with the grates of the fire box and was used for shaking the grates. After plaintiff was injured, he remained on the engine about twenty minutes before seeking medical attention. During that time the engine returned to the ten-car string and coupled onto it for the purpose of moving the first car of the string, which was not one of the interstate cars. After it was placed on the house track, plaintiff said he could not work any longer. Plaintiff was taken to a doctor and the other men on the engine stopped for a lunch before they broke up the rest of the string.

Defendant contends that this demurrer to the evidence should have been sustained for two reasons:

First: That there was no substantial evidence that the en-

gineer came in contact with the shaker bar or in any way caused plaintiff's injury.

Second: That the evidence conclusively established that the plaintiff was not engaged in interstate transportation at the time he sustained his injury.

Upon the first proposition, defendant argues that the physical facts show that the engineer's foot could not have come in contact with the shaker bar, in stepping from the left side of the engine to the right, because there was a hand operated fire door lever standing out ten and three-fourths inches from the boiler head and a throttle lever guide extending twenty-two inches, while the shaker bar was leaning closer to it. However, the testimony as to the position of these projections was that they there were farther to the right than the shaker bar and the photograph of the interior of the engine, in evidence, so shows. We cannot say from the testimony that it was physically impossible for the engineer's foot to strike the shaker bar in stepping back from the left side of the engine to the right. Defendant really argues the weight of its evidence as against plaintiff's, because of the physical facts, because of the written statement of plaintiff that the fire door knocked the shaker bar down, and also because of oral statements, which it had testimony to show that plaintiff made, to the same effect.

Defendant states in its brief that "although the plaintiff testified that the engineer, in stepping from the left side of the engine to the right side, came in contact with the shaker bar with his left foot, this testimony is directly in conflict with the testimony of defendant's witness Walder, the engineer, who testified distinctly that his foot did not touch this shaker bar at that time." However, defendant argues its conception of the Federal rule, concerning conflicting testimony, upon passing upon a demurrer to the evidence. This court has recently reviewed the Federal decisions, cited by defendant, and passed upon the contentions he makes in three cases, decided at the present September, 1933, term, and held that a direct conflict in testimony as to facts, such as defendant admits exists here, requires submission thereof to the jury for their determination. [Hardin v. Illinois Central Ry. Co., 334 Mo. 1169, 70 S. W. (2d) 1075; Parrent v. Mobile & Ohio Railroad Co., 334 Mo. 1202, 70 S. W. (2d) 1068; Grange v. Chicago & Eastern Illinois Ry. Co., 334 Mo. 1040, 69 S. W. (2d) 699.] The trial court was correct in doing so in this case.

The second ground upon which defendant claims a demurrer should have been sustained presents a closer question. "Owing to the fact that, during the same day, railroad employees often and rapidly pass from one class of employment to another, the courts are constantly called upon to decide those close questions where it is difficult.

to define the line which divides the State from the interstate business.'' [New York Central & H. Railroad Co. v. Carr, 238 U. S. 260, 35 Sup. Ct. 780, 59 L. Ed. 1298.] ''This is necessary because the question is the fundamental one of jurisdiction. If the employee is not engaged in commerce 'among the several states,' Congress has no authority to legislate concerning his rights and remedies for injuries sustained. [Article 1, Sec. 8, Clause 3, Constitution of the United States.] Likewise, if he is so engaged, since the entire subject of injuries in interstate commerce is so completely covered by Federal acts, the states cannot make any provisions concerning them regardless of whether or not Congress has provided liability for every injury. [New York Central Railroad Co. v. Winfield, 244 U. S. 147, 37 Sup. Ct. 546, 61 L. Ed. 1045, L. R. A. 1918C, 439, Ann. Cas. 1917D, 1139.] It is, therefore, the nature of the work which the employee was doing *at the time* of the injury and not what he later expects to do which determines the question.'' [Milburn v. Chicago, M., St. P. & P. Railroad Co., 331 Mo. 1171, 56 S. W. (2d) l. c. 86.]

██ ''The criterion of applicability of the statute is the employee's occupation *at the time of his injury in interstate transportation or work so closely related thereto as to be practically a part of it.*'' (Italics ours.) [New York, New Haven & Hartford Railroad Co. v. Bezue, 284 U. S. 415, 52 Sup. Ct. 205, 76 L. Ed. 370, 77 A. L. R. 1370; Chicago & Eastern Ill. Railroad Co. v. Industrial Commission, 284 U. S. 296, 52 Sup. Ct. 151, 76 L. Ed. 304.] ''It turns upon no interpretation of the act of Congress, but involves simply an appreciation of the testimony and admissible inferences therefrom in order to determine whether there was a question to be submitted to the jury as to the fact of employment in interstate commerce.'' [Erie Railroad Company v. Welsh, 242 U. S. 303, 306.] ''The particular act which attends the injury is significant only as it shows or tends to show the 'nature of the work,' with respect to interstate commerce. It may or may not be sufficient, of itself, to show that nature. But, while the specific act in progress at the moment of injury may be devoid of character as to commerce, or may tend to show that the employee's work was intrastate in nature, yet, if such act is considered as one step in a series of acts, it might clearly show the work to have been interstate in nature.'' [2. Roberts' Federal Liability of Carriers (2 Ed.), sec. 727, p. 1373.]

The fact that an employee engaged upon work which was not interstate in character ''was expected, upon completion of that task, to engage in another which would have been a part of interstate commerce is immaterial under the statute, for by its terms the true test is the nature of the work being done at the time of the injury.'' [Ill. Central Railroad Co. v. Behrens, 233 U. S. 473, 34 Sup. Ct. 646, 58 L. Ed. 1051.] However, when an employee has commenced to do

acts preparing an engine for interstate work "the circumstance that the interstate freight cars had not as yet been coupled up is legally insignificant." [North Carolina Railroad Co. v. Zachary, 232 U. S. 248, 34 Sup. Ct. 305, 58 L. Ed. 591.] "If he is hurt in the course of his employment while going to a car to perform an interstate duty . . . he is entitled to the benefits of the Federal Act." [New York Central & H. Railroad Co. v. Carr, supra.] "Employment follows interstate transportation and begins when the workman, on the carrier's premises, makes a forward move to serve in that traffic." [Koons v. P. & R. Ry. Co. (Pa.), 114 Atl. 262, and cases cited, l. c. 263; Patterson v. Penn. Ry. Co. (Pa.), 131 Atl. 484, certiorari denied 270 U. S. 649, 46 Sup. Ct. 349, 70 L. Ed. 780; St. L., S. F. & T. Railroad Co. v. Seale, 229 U. S. 156, 33 Sup. Ct. 651, 57 L. Ed. 1129.]

A case which is perhaps more nearly in point, here, than any which has come to our attention is McKay v. Monongahela Ry. Co., 44 Fed. (2d) 150. There plaintiff, engaged in interstate work of inspecting outgoing locomotives, was requested to operate a crane in the shops nearby to lift an engine not engaged in interstate transportation. Plaintiff said that he went into the crane cage, placed the engine as requested, and "then started to get down out of the cage, and go to his work of inspecting locomotives . . . used exclusively in interstate commerce; . . . that in getting out of the cage he put his hand on a part of it, or upon some of its attachments, which had been electrified by an improperly insulated wire, and received a shock from it; that he lost his grip and footing in consequence, and fell 40 to 50 feet to the floor below and was severely injured." The United States Circuit Court of Appeals, upon the authority of the above cases, said:

"If the defendant had finished his temporary intrastate work on the crane and had started back to inspect locomotives on the outbound track to be used in interstate commerce when his hand came in contact with the uninsulated wire while getting out of the cage and caused the injury complained of, he was engaged in interstate commerce at that time. . . . So whether or not the plaintiff was engaged in interstate commerce at the time of the accident was a question of fact to be determined by the jury."

We think that the evidence in this case when viewed, as it must be, most favorably to plaintiff, likewise justified the submission to the jury of the question of whether or not plaintiff was engaged in interstate transportation at the time he was injured. The testimony as well as the switching list shows or reasonably tends to show that the switching crew brought in from Davis Junction a string of ten cars, three of which were moving in interstate transportation; that they placed them upon track No. 6 for inspection and marking; that immediately upon the completion of inspection and marking, it was

their duty to break up the string and place the cars where they belonged; and that part of the cars to be thus moved were the three interstate cars. It is immaterial that the first car in the string to be taken away and placed on another track was not an interstate car, or that the crew stopped for a lunch after taking it to its destination, before they proceeded to break up the rest of the string and take the interstate cars to their respective destinations. [See Milburn v. C., M. St. P. & P. Railroad Co., 331 Mo. 1171, 56 S. W. (2d) 80, l. c. 85, and authorities cited.] The evidence further clearly tends to show that, while waiting for the inspection and marking to be completed, which had to be done before the switching crew could further move the interstate cars, the switching crew merely moved aside from the interstate work, upon which they were engaged and which they were to continue immediately upon the completion of the inspection and marking, to perform another task which was intrastate in character; that they had completed this work by kicking the empty cars onto the house track; and that they had commenced to move again toward their interstate work with the purpose of continuing it.

This is not a case where an employee was injured while actually engaged in intrastate work and was merely expecting, after completing it, to later do interstate work, as in the Behrens case and others relied upon by defendant. Nor is this a case where a crew was sent out to do a specific intrastate task and, after completing it, was on its way back for orders, not knowing what the next work would be as in Erie Railroad v. Welsh, supra. Here, plaintiff and his crew had their orders. They were executing them, when they were bringing the ten-car string from Davis Junction and when they were placing it in the Cairo yards. They were temporarily interrupted in carrying their orders to immediate completion, because it was necessary to have the cars inspected and marked before they could do so. While waiting to continue and complete this interstate work in compliance with their switching list, they merely moved aside to perform a task which was intrastate, and which apparently had no connection with their interstate work. Under these circumstances, when they completed that merely intervening task and began to move again in the direction of the interstate work, which they had been directed to do and which was the principal mission they had been sent out to perform, for the purpose of continuing it and completing their orders in regard to it, they were engaged again in the work of interstate transportation. The trial court was correct in submitting to the jury, for their decision, the question of the character of plaintiff's work at the time of his injury.

 Defendant does not complain of the instruction upon which the issues were submitted but contends that the verdict was excessive.

The amount of the verdict was $14,500. Plaintiff completely lost the sight of his left eye. His medical testimony was "there will never be any sight in that eye and eventually the eye will have to be taken out to save the right eye. That is so because of sympathetic trouble. It will affect the right eye. The whole inside of the left eyeball is affected." While the vision of plaintiff's right eye was also impaired this was not due to the injury to the left but to astigmatism which had previously existed. Plaintiff was forty-four years of age at the time of the trial, had worked for the defendant about twenty-five years and was qualified to run an engine, whenever his seniority entitled him to do so. He was earning at the time $180 per month. For four months before he went to the job of firing a switch engine, he was earning $240 per month. He was completely disabled from working as fireman or engineer. This court has upheld a verdict for $15,000 for the loss of an eye in Russell v. Mo. Pac. Ry. Co., 316 Mo. 1303, 295 S. W. 102, and in Downing v. Loose-Wiles Biscuit Co., 320 Mo. 819, 8 S. W. (2d) 884. It has sustained verdicts for $12,500 for the loss of an eye in Adams v. Q., O. & K. C. Ry. Co., 287 Mo. 535, 229 S. W. 790; Knott v. Mo. Boiler Works, 299 Mo. 613, 253 S. W. 749, and Loduca v. St. Louis-San Francisco Ry. Co., 315 Mo. 331, 289 S. W. 908. [See, also, Cunningham v. Doe Run Lead Co. (Mo.), 26 S. W. (2d) 957.] We hold, that considering plaintiff's injury, age and earning capacity, the verdict is not excessive.

The judgment is affirmed. *Ferguson* and *Sturgis, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur, except *Hays, J.,* absent.