LEONARD BIRDSONG, BY NEXT FRIEND, APPELLANT, v. HERBERT JONES, ET AL., RESPONDENTS.—30 S. W. (2d) 1094.

Kansas City Court of Appeals. May 26, 1930.

*Walsh & Parker* for appellant.

*Watson, Gage & Ess* and *Mosman, Rogers & Buzard* for respondents.

BLAND, J.—This is an action for damages for personal injuries. Plaintiff recovered a verdict and judgment in the sum of $5000. The court sustained defendants' motion for a new trial without assigning any reason therefor. Plaintiff has appealed. This is the second appeal in the case. [See Birdsong v. Jones et al., 8 S. W. (2d) 98.]

This action is brought by plaintiff through his next friend against the defendants who are the present trustees under the last will and testament of William R. Nelson, deceased. The suit is for damages for personal injuries which plaintiff received while in the employ of Laura Nelson Kirkwood, who was, at the time of the receipt of said injuries, trustee under the last will and testament of said Nelson, and as such was operating and conducting the affairs of a newspaper known as the Kansas City Star.

The facts show that plaintiff went to work for Laura Nelson Kirkwood, the trustee aforesaid, at the Kansas City Star building in Kansas City about the first day of May, 1923; that he was engaged in the work of carrying newspapers from the presses to the elevator and general "clean-up" boy in the room in which the newspaper printing presses were situated. There were nine presses in the room; five or six of these were situated along the south wall of the room and the others along the north side. Immediately north of each press on the south side of the room was a hydraulic hoist or elevator. Each of these elevators was of the plunger type, being raised and lowered by a stem attached to its under middle. These elevators were 55 or 56 1-2 inches wide and 76 inches in length. The width of the elevators was north and south, the length east and west. They were freight elevators and were used primarily as such for lifting large rolls of paper weighing about 1500 pounds each and about six feet in length. These rolls of paper were transported from the sub-basement to the level of the basement floor proper to be used in the presses located there.

Plaintiff was injured while operating elevator number four by getting his foot caught between the elevator and the floor of the press room. The floor of this room where the elevator came through was about three feet deep. The opening started with the top of the floor and ran downward 18 inches in a perpendicular direction and then flared out on all four sides. There was a clearance of from two to three inches between the sides of the elevator and the 18-inch thickness of the surrounding floor. The elevator consisted of merely a platform without any sides, gates or guards, except that it had a guard on the west side about 2 1-2 or 3 feet long and about 3 or 4 inches high. The elevator was operated by two cables, running through guides, referred to in the evidence as controls. These controls were on the west end of the elevator about 2 or 3 feet inward toward the center, being nearer the north end than the south. They extended the length of the elevator shaft and ran through guides attached to the sides of the elevator.

The evidence shows that plaintiff was 16 years and one month of age at the time he was injured on May 14, 1923; that there were employed about the premises about 20 boys near the age of plaintiff, some younger, some older; that these boys, including plaintiff, as well as adult employees in the press room, would use the elevators in going to and from the basement when they were not being used to transport rolls of paper. Plaintiff testified that his working hours were from 10 P. M. until 4 A. M. and that he had been using the elevators 20 or 25 times every night. At the time he was injured plaintiff had gone to the basement to procure a broom and was returning with the broom, which he had laid upon the elevator, when he was injured. Another boy, also a minor, by the name of Galvin was riding upon the elevator which plaintiff was operating.

Plaintiff's evidence is conflicting as to which end of the elevator he was stationed. It fairly appears from his testimony that he was standing at the controls but whether on the east or west end of the elevator he was not certain but thought that he was standing on the northeast end facing east. However, it is undisputed that the outer edge of his right foot was injured and the physical facts would indicate that he was standing facing toward the west, as it would appear that his foot was caught between the north end of the elevator and the floor. However, this conflict in the testimony will be discussed later.

Plaintiff testified that he did not notice the position of his foot but thought that it was safely upon the elevator platform; that he could have seen where his foot was stationed had he looked, but at the time his foot was caught his attention was directed to the operation of the elevator, that is the guides and the floor where he was about to stop the elevator. He admitted that he had been talking with Galvin but stated that when his foot caught he was not talking and that his head was not turned away from the cables; that at this time his head and shoulders were about at the upper part of the floor of the press room and "I was trying to stop the elevator." We take this to mean that he had his attention directed to the stopping of the elevator when it should reach the proper place and that he was watching the floor and the controls. Apparently his foot caught at a point 18 inches below the top of the floor. It was not freed until the elevator passed the level of the floor when the elevator was stopped by Galvin. Plaintiff further testified:

"Your body would be up first, of course, and your head would be above the floor level, and you would have to look for the level of the floor so you could make it even, make an even stop. So you would have to watch the control, watch the cables and watch the landing at the same time.

"I had my head turned this way, watching the cable and the floor at the same time when my foot was caught, and the only thing that I could say was that there wasn't any guard there and my foot was sticking over say about an inch and a half, and my foot was caught."

Plaintiff testified that no one warned him of the dangers attending the use of the elevator; that no official instructed him as to its operation but that some of the employees about the place showed him how to use it.

Galvin testified that he was riding on the elevator with plaintiff at the time the latter was hurt; that plaintiff was operating the elevator; that the witness was on the opposite side of the elevator from plaintiff; that the controls were on the west side of the elevator and that plaintiff was on the north end of it.

On behalf of plaintiff one Rafiner, a manufacturer and repairer of elevators, testified that he had seen elevators that were in the plant of the Kansas City Star in 1923 and was vaguely familiar with them; that there were no guard or guards of any kind on these elevators; that a collapsible gate could have been put on the elevator in question (a photograph of which was shown him) which would have allowed sufficient clearance for the rolls of paper without interfering with the primary purpose of the elevator in transporting such rolls from the sub-basement to the presses. He gave a complete explanation as to how this gate would function and described the manner in which it would have prevented one from allowing his foot to protrude over the side of the platform or elevator. He further testified that he had seen two or three of this type of elevator, which he described as the inverted type, with such guards upon them; that he had seen these since the year 1923; that he was familiar with this class of appliances but did not know whether this type of elevator was used in newspaper plants; that the inverted type of elevator was a common type; that the gates he described were not commonly found on them but that such gates were practical.

Defendants produced two expert witnesses upon the question of the practicability of guarding the elevator in question and both testified that it would have been impractical to guard it. One testified that he had never seen an elevator of this type equipped with gates or guards and that the guard described by the witness Rafiner was impractical. Neither of defendants' witnesses testified that it was within their experience that elevators of this type were at any time used as passenger elevators or that it was the custom to use them as such. However, one of them stated that he had no knowledge of such a use. They both testified that the elevator in question was of a standard type of elevator.

One of the assignments in the motion for a new trial was that the verdict was against the weight of the evidence. The court having failed to state its reasons for granting the new trial it may be assumed that it was upon the ground that the verdict was against the weight of the evidence. The rule is well established that the trial court may grant one new trial on the ground that the verdict is against the weight of the evidence and that when a motion for a new trial has been sustained under such circumstances the action of the trial court will not be disturbed by the appellate court if there is substantial evidence to justify a result contrary to the verdict, and in no case, will the granting of such a new trial be disturbed unless the evidence is such that no verdict in favor of the party to whom the new trial was granted could be allowed to stand. [Bernheimer v. Scott, 228 S. W. 523; Lindsay v. Shaner, 291 Mo. 297.]

Plaintiff insists that if the court granted the new trial on the ground that the verdict was against the weight of the evidence

it abused its discretion. In this connection plaintiff points out that defendants had no testimony except as to the practicability of guarding the elevator and, as we understand his contention, he claims that if he made out a prima-facie case the court should not have granted the motion for a new trial on the ground stated. Of course, there is no merit in this contention. The question of the demurrer to the evidence and the question of the weight of the evidence was entirely different. One goes to the question of law, the other to one of fact. The evidence as to the practicability of guarding the elevator is conflicting. The court in passing upon the motion for a new trial had a perfect right to disbelieve plaintiff's witnesses upon this issue. Aside from that, as will hereinafter be pointed out, the evidence of plaintiff himself is very conflicting, so much so that the trial court was at liberty to refuse to believe that plaintiff was injured in the way he claimed.

However, plaintiff says:

"In view of the fact that the trial court requested briefs to be handed him in the matter, and in view of the fact that respondents filed a voluminous brief and that they argued the same at great length on the motion for a new trial. and in view of the fact that respondents eminently urged and stressed the alleged error contained in appellant's instruction on the measure of damages, it cannot be said here that this point has any merit or actuated the trial court in his judgment. This being true, it is in accordance with the discussion of the very point contended in Lowry v. Smith, 198 S. W. l. c. 440, point 5, and cases cited thereunder."

In his reply brief plaintiff states that what he said in his original brief, which we have quoted, was contended by him in the oral argument and was not then denied by the defendants or is it denied in defendants' brief. We have examined the case of Lowry v. Smith cited by plaintiff and concluded from reading the opinion in that case, that it was substantially admitted by both parties that the new trial was granted on account of error in the giving of an instruction and not on the ground that the verdict was against the weight of the evidence. There is no such admission in this case unless the mere failure of plaintiff to deny statements made by defendants in this court outside of the record constitutes such an admission. Defendants, in their brief, admit nothing but insist on the point that the judgment must be affirmed for the reason that it will be assumed by this court that the trial court granted the new trial on the ground that the verdict was against the weight of the evidence, and evidently relies upon this point. Cases in this court are decided upon the record and a party is under no duty to reply to a statement of his opponent made outside of the record. Any other rule would lead to the utmost confusion. As the case no doubt will be retried it is appropriate to pass

upon other points urged in defendants' brief supporting the action of the court in granting the new trial.

We think there is no question but that the court erred in giving plaintiff's instruction No. 2. This is a long instruction and it is unnecessary to set it out. Suffice it to say that the instruction is upon the alleged negligence of defendants in failing to guard the elevator. The instruction purports to cover the entire case and directs a verdict for plaintiff upon the finding of the facts hypothesized in the instruction. Among other things it tells the jury:

"If you further find and believe from the evidence that there was no guard around that portion of said hoisting platform whereat plaintiff was injured, *or that there was nothing there in the nature of safety appliances to have reasonably safeguarded the plaintiff* against the injury complained of in the evidence," etc. (Italics ours.)

The negligence alleged in the petition is that Laura Nelson Kirkwood, trustee, failed to furnish plaintiff with a reasonably safe place to work; that she "negligently and carelessly failed and omitted to guard, protect or enclose said elevator or lift with a cab, guard, enclosure or other protection," and that she negligently failed and omitted to warn and instruct plaintiff in and about the performance of his duties. It will be noted that the instruction not only submits the failure to guard but submits in conjunction therewith "that there was nothing there in the nature of safety appliances to reasonably safeguard plaintiff." Even assuming that the words "or other protection" as used in the petition are broad enough upon which to submit negligence in the failure to provide safety appliances generally, other than a guard, still there is no evidence that any other safety appliance could have been furnished.

It is well settled that instruction should follow the pleading and the proof and should not be broader than either, and that instructions that are broader than the proof are erroneous. [Degonia v. Railroad, 224 Mo. 564; State ex rel. v. Ellison, 270 Mo. 645.] Plaintiff's instruction No. 2 virtually gave to the jury a roving commission to find that the trustee in question might have used any safety appliance that their imagination might suggest, whereas there was no evidence of the practicability of a safety appliance other than a guard.

It is insisted by defendants that their demurrer to the evidence should have been sustained. In this connection defendants contend that "the injury and the circumstances surrounding the same were not shown in evidence." This contention is based upon the conflict in plaintiff's testimony. Plaintiff first stated that he was standing on the northeast side of the elevator facing east and as far as he could remember the controls were on that side. On cross-examination he stated he did not remember whether or not the controls were on the east or west end of the elevator; that as far as he remembered

they were on the east end. He later stated he was sure they were on the east end. Thereafter, in answer to a question as to whether his memory had been refreshed about the matter that the controls were not on the east end but on the west end, he said, "well—well, yes." He then stated that if the controls were on the west end of the elevator he was facing west at the time he was hurt but that he and the controls were on the east end. He then stated that when the case was tried before his attorney admitted that the controls were on the west end; that the admissions of his attorney "might be true," but he did not remember it that way: "Well you have just forgotten about it, that is a fact, isn't it? A. Well, it looks that way." He was asked about the matter several times thereafter and each time stated that as he remembered it he was standing on the east side of the elevator.

At one place he testified that he was standing on the east side of the elevator but did not know whether the controls were there, but whether they were or not he was standing on the east side; that he did not know whether he "had the controls or not." Later the following occurred:

"Q. Well, we will pass that. Now Mr. Birdsong, referring again to the controls of this elevator, we finally came to the conclusion that they were either on the east or the west end of the elevator, that is true, isn't it? A. Yes.

"Q. (By MR. ROGERS): Now you know where they were, don't you? I want you to swear to this jury where they were. A. I don't know where they were. The best I can remember they were on the east end.

"Q. You say you don't know where they were? A. That is my story and I will stick to it.

"Q. That is, that they were on the east end? A. To the best of my recollection."

. . . . .

"Q. Now, do you mean to tell the court and jury you don't know where they were? A. The best that I can remember they were on the east end and I will think they were on the east end to my dying day.

"Q. Do you mean to tell the jury that those controls were on the east end? A. To the best of my knowledge, they were.

"Q. Well, don't you remember about it? Tell the court and jury about it. Don't you know where they were? A. As I remember, they were on the east end."

. . . . .

"Q. You will not say positively, that the controls were on the east side, will you? A. Why, I don't know how to answer that, because to my knowledge they were on the east side, and I still think and I always will think that they were on the east side."

. . . . . . .

"Q.  And if the controls were over on the west end of the elevator you weren't injured in that manner, were you? A. No, sir.

"Q.  No, but the fact of the matter is, you don't remember much about this accident, do you? A. No, sir, it's been quite a while ago."

The case was tried on the 12th day of November, 1928, about five and one-half years after plaintiff was injured.

The testimony of Galvin shows that plaintiff was operating the elevator; that plaintiff was in a stationary position on the north end of the elevator and that the controls were on the west side of the elevator.  The physical facts show that plaintiff was mistaken when he stated that he was on the east side of the elevator facing toward the east, in view of the fact that his right foot was injured.  It was within the province of the jury, under all of the circumstances to find that plaintiff was mistaken when he said that the controls were on the east side of the elevator and that he was standing on that side with his face to the east, and to conclude that as a matter of fact the controls were on the west side and that plaintiff was stationed on that side.

It is claimed that the demurrer to the evidence should have been sustained for the reason that there was no negligence shown on the part of the defendants in failing to guard the elevator.  In this connection it is contended that the evidence shows that the elevator in question was such a one as is in common and ordinary use in Kansas City by persons engaged in the same or similar lines of business and that such elevators were used by persons riding upon them in the course of their work; that the testimony of Rafiner was not sufficient to submit to the jury the question of defendants' negligence in the matter of guarding the elevator.

The duty of a master to use ordinary care to provide his servant with reasonable safe appliances and machinery does not require him to furnish the newest and best appliances and if the master furnishes appliances that are customarily used by ordinarily prudent persons in the same business, he is not negligent.  However, such custom must be uniform, and if there is any material variation therefrom, the question of the master's negligence is for the jury.  This we think is the holding of the Supreme Court in the case of Knott v. Mo. Boiler & Iron Works, 299 Mo. 613, wherein the cases relied upon by the defendants are distinguished.  In that case plaintiff was injured by a pneumatic riveter.  There was testimony that if the riveter had been supplied with a certain guard manufactured by the maker the injury would not have occurred; that this guard was practical; that it could have been attached at moderate cost without impairing the efficiency of the machine; that the guard had been in use for two years in numerous other cities but not in the city in which plaintiff was employed, nor in this State.  It was not shown by the plain-

tiff that it was the common and general custom to use a riveter equipped with a safety device, nor was it shown that a riveter so equipped with such a device was in common and general use at and prior to the time plaintiff claims to have been injured, nor was it shown that it was the common and general custom to so equip all riveters with such safety appliance at and prior to the time plaintiff claims to have been injured. Defendant's evidence tended to show that the riveter without the guard was the ordinary, usual and customary riveter generally used in the business of boiler-makers. But as before stated, the evidence showed that there were some exceptions to such general use of the riveter without the guard. The court held that the case was properly submitted to the jury on the negligence of the defendant in failing to guard.

In the case at bar there was positive testimony on the part of plaintiff's witness, Rafiner (who was a manufacturer and repairer of elevators) that the elevator in question could have been guarded by the use of a collapsible gate, explaining the matter at length. It is true that he had seen but few of this type of elevator guarded in the way he described but his evidence shows that it was practical to guard them. His testimony on the subject was substantial and it was for the consideration of the jury.

Defendants' expert witnesses did not testify as to in what plants this type of elevator (unguarded) was used, but did testify that it was impractical to guard them and that they were in general use. They did not testify that they were used as passenger elevators. Therefore, there was no evidence on the part of the defendants tending to show what was the custom among the people using such elevators as passenger elevators. [Fishell v. Am. Press, 253 S. W. 508, 511.]

There is no doubt that permitting children to use an elevator of this kind under the circumstances was dangerous and clearly constitutes want of due care on the part of the defendants, if practical at all to guard it or otherwise protect it. It was well said in the case of McDonough v. Lampher, 55 Minn. 501 (which involved an elevator very similar to the one in the case at bar), quoting from the case of Wise v. Ackerman, 76 Md. 375:

"But an elevator is in many respects a dangerous machine, and, though it may be primarily intended only as a freight elevator, yet, if the employees, in the course of their employment, are authorized or directed to use the elevator as a means of personal transportation, the employer controlling the operation of the elevator is required to exercise great care and caution, both in the construction and operation of the machine, so as to render it as free from danger as careful foresight and precaution may reasonably dictate."

It is quite apparent that a child might at most any time get his foot caught in an unguarded elevator of this kind as did plaintiff.

Such an employee while riding with another on the elevator might accidentally or playfully be pushed by such other employee causing the former's foot to get off the platform and be caught as was plaintiff's. In the case of Fishell v. Am. Press. Co., which involved an elevator similar to the one in the case at bar, plaintiff, a minor, attempted to sit down on one of the bundles he was transporting upon the elevator and while he was in the act of doing so his feet slipped from under him and went over the edge of the platform. In the case of Obermeyer v. Chair Mfg. Co., 120 Mo. App. 59, 229 Mo. 97, a boy stepped upon plaintiff's foot causing the latter to draw his foot away so that it was caught between the floor of the elevator and one of the other floors which the elevator passed. These cases afford instances where casualties of this kind might very well happen and show a dangerous situation.

We think there is no doubt but that the evidence shows that it was practical to guard the elevator in question, and apparently at a reasonable cost, without affecting its use for the primary purpose that it was intended, that is a freight elevator to transport large rolls of paper. There being no evidence that an unguarded elevator of this kind was used anywhere else as a passenger elevator the case clearly was one for the jury. At another trial the evidence must be undisputed that there is a custom or practice, practically universal, to use such freight elevators, unguarded, as passenger elevators in order to authorize the court to take the case from the jury.

It is contended that the plaintiff was guilty of contributory negligence as a matter of law. In this connection defendants point out that plaintiff testified that he knew if his foot extended over the edge of the platform as the elevator was going through the floor his foot would be injured; that he had operated the elevator 250 times in two weeks and was fully aware of the conditions surrounding its operation; that he admitted that he did not look where his foot was placed as he approached the floor. However, his evidence shows that he had his attention directed upon stopping the elevator at the floor and that he did not know that his foot was protruding over the side of the platform but thought that it was safely on the elevator. We cannot say that under the circumstances that plaintiff, being a minor approximately 16 years of age, was guilty of contributory negligence as a matter of law. [Timmerman v. Frankel Frank, 172 Mo. App. 174; Obermeyer v. Chair Co., supra; Winkle v. Dry Goods Co., 132 Mo. App. 656; Martin v. Kline Apparel Co., 249 S. W. 965; Czernicke v. Ehrlich, 212 Mo. 386, 395.] We have examined the cases cited by the defendants on this question and find them not in point.

It is insisted that the court erred in giving plaintiff's instruction No. 3, which is on the measure of damages and instructs the jury that they might take into consideration, among other things, "the injury, if any, to his earning capacity." It is claimed that plaintiff,

not having been shown to have been emancipated, was not entitled to recover for the loss to his earning capacity during his minority. No limiting instruction was offered by the defendants or given by the court. A similar instruction was held to be erroneous by this court in the case of White v. Ennis Coffee Co., 182 S. W. 775. However, in the case of Steinkamp v. Chamberlain, 294 S. W. 762, the St. Louis Court of Appeals held that such an instruction was good as far as it went and that if the defendant desired an instruction restricting the measure of plaintiff's recovery as to such an element of damage, defendant should have requested such an instruction, which it failed to do. The two reported cases seem to be in conflict. At another trial no doubt plaintiff will so word his instruction as to obviate any question as to its propriety, in view of the holding of this court in the case of White v. Ennis, supra.

It is insisted that the court erred in giving plaintiff's instruction No. One. This instruction was upon the question of the care required of a minor 16 years of age, and while it drew the attention of the jury to the question of the age and capacity of plaintiff, it did not mention the matter of his experience. At another trial, if this instruction is given at all, it should be reframed so as to comply with the statement of the law in the case of Longree v. Mfg. Co., 210 Mo. App. 478, 496, 497.

At the next trial plaintiff's instruction No. 4 should not be given. This instruction is merely a statement of abstract propositions of law. The practice of giving such instructions is generally condemned. [Underwood v. Hall, 3 S. W. (2d) 1044.]

It is insisted that the court erred in refusing to give defendants' instruction K, but in view of what we have said in connection with the demurrer to the evidence it is apparent that this instruction was properly refused. It reads as follows:

"You are instructed that if you find and believe from the evidence that the elevator in question was such a one as was ordinarily used by persons engaged in the same or similar line of business and under same or similar circumstances and was reasonably safe for use in such business, then regardless of all other questions in the case your verdict must be for the defendants."

We are indebted to counsel on both sides of this case for the manner in which they have briefed it. The briefs reflect unusual industry and learning in the writers thereof and have been of great assistance to the court.

The judgment is affirmed. *Arnold, J.,* concurs; *Trimble, P. J.,* absent.

### ON MOTION FOR REHEARING.

Respondents filed a motion to dismiss the appeal because appellant's abstract does not show that plaintiff saved any exception to the action

of the court in sustaining the motion for a new trial. The failure to note such an exception is not ground for dismissal of an appeal for, under such circumstances, the record proper is before the court.

However, under the provisions of the amendment to rule 15 of this court respondents waived their objection to appellant's abstract. Appellant's abstract was served upon respondents on March 11, 1930. The case was set for April 8, 1930. The motion to dismiss was served upon appellant on April 5, 1930. Our rule in question provides in part as follows:

"Such objections and the reasons therefor shall be served in writing on appellant or plaintiff in error, or his counsel, ten days before the day on which the cause is docketed for hearing or within ten days after the abstract is served. Any such objections not so specified shall be deemed waived and will not be considered by the court. After service of such objections and reasons, appellant or plaintiff in error shall have eight days within which to perfect his abstract of the record by filing in this court a certified copy of so much of the record proper or bill of exceptions as will show the true entries, orders or rulings with respect to which the sufficiency of the abstract of record is challenged."

However, appellant has complied with the rule relative to furnishing a certified copy of the Bill of Exceptions by filing on April 7, 1930, a certified copy of the order overruling the motion for a new trial and his exceptions to the action of the court in that regard.

The other matters contained in the motion for a rehearing were all covered in our original opinion.

The motion for a rehearing is overruled. *Arnold, J.*, concurs; *Trimble, P. J.*, absent.